STATE OF NORTH CAROLINA          IN THE GENERAL COURT
COUNTY OF ORANGE                        OF JUSTICE
                                 SUPERIOR COURT DIVISION
                                 File No. 23-CVS-_____

BERNADETTE AYDLETT and          )
ERICA AYDLETT,                  )
                Plaintiffs,     )
                                )
vs.                             )       COMPLAINT
                                )
NISSAN OF ELIZABETH CITY,       )    JURY TRIAL DEMANDED
LLC,                            )
                Defendant.      )
                                )

Now come Plaintiffs Erica Aydlett and Bernadette Aydlett, complaining of the Defendant, Nissan Of Elizabeth City, LLC ("Nissan"), and alleging and saying:

## INTRODUCTION

This is an action to redress the injuries that the Plaintiffs, a mother and daughter, suffered when Defendant Nissan, an automobile dealer, engaged in unfair and deceptive trade practices, breach of fiduciary duty, and other violations of state law. After the car the Aydletts had bought from Nissan was totaled in an accident, Nissan refused to refund unearned portions of the Aydletts' gap insurance premium and service contract. As a result, the Aydletts were unable to pay off their vehicle loan, and their lender charged it off, causing derogatory credit reporting that will affect the Adyletts' credit histories and scores for seven years.

1

## JURISDICTION

1. This action arises out of Defendant Nissan's violations of the Unfair and Deceptive Trade Practices statute ("UDAP"), N.C. Gen. Stat. §§ 75-1.1, et seq., and of North Carolina common law fraud, negligent misrepresentation, breach of contract, breach of fiduciary duty, and negligence.

2. Venue is proper in this judicial district under N.C. Gen. Stat. § 1-82 because Plaintiff Erica Aydlett resides here.

3. This case is brought within four years of the alleged unfair and deceptive trade practices, in compliance with the statute of limitations at N.C. Gen. Stat. 75-16.2, and within three years of the alleged fraud, negligent misrepresentation, breach of contract, breach of fiduciary duty, and negligence, in compliance with the statutes of limitations at N.C.G.S. § 1-52.

## PARTIES

4. Erica Aydlett ("Erica") lives in Orange County, North Carolina.

5. Bernadette Aydlett ("Bernadette") lives in Pasquotank County, North Carolina. Bernadette is Erica's mother.

6. Defendant Nissan of Elizabeth City, LLC, a Florida limited liability company, operates a car dealership in Pasquotank County, North Carolina. Its principle place of business is at 1712 N Road St. Elizabeth City, North Carolina 27909, and its registered agent, Auto Central Services, Inc.,

is at the same address.

## FACTS

### Plaintiffs' Backgrounds

7. Erica Aydlett is a student completing a master's degree in health care administration. She also works full time for a statewide healthcare provider.

8. Erica's mother, Bernadette Aydlett, works in patient customer service at a hospital, and is also the primary caregiver for her physically disabled husband.

### Service Contract and GAP Waiver Purchase

9. In October 2021, Erica bought a car from Nissan.

10. Along with the car, Nissan sold Erica a vehicle service contract for $1,900.00.

11. The vehicle service contract was to remain in effect until August 29, 2026.

12. The vehicle service contract's terms provided that, if the contract was cancelled, the service provider would issue a refund of a portion of its cost. That amount would depend on how long the contract had already been in force and/or the mileage accrued on the vehicle.

13. Nissan also sold Erica a GAP waiver for $600.00.

14. "GAP" stands for "guaranteed asset protection."

3

15. A GAP waiver is an optional add-on to a vehicle purchase that protects a borrower from financial issues if something happens to the vehicle before they pay off their loan, such as a total loss or a theft.

16. In the event of a total loss, the borrower's regular car insurance will pay the lender the vehicle's actual cash value.

17. The GAP waiver may then cover the difference between that actual cash value payout and any remaining amount a borrower owes on their loan.

18. Nissan arranged financing for the vehicle purchase with a third party lender ("the lender").

19. Bernadette co-signed on the car loan with Erica.

20. In purchasing and financing the vehicle service contract and GAP waiver from Nissan, Erica and Bernadette placed their trust and confidence in Nissan to transmit in a timely manner to their lender any vehicle service contract refunds or GAP waiver payments or refunds due to them in the event of total vehicle loss.

### Nissan Lies to Plaintiffs and Steals Their Refund Money

21. In August 2022, Erica was in a car accident in the vehicle she had purchased from Nissan and financed with the lender, and the vehicle was totaled.

22. After Erica's insurer paid out to the lender the actual cash value

4

of the vehicle, a balance still remained on the Aydletts' loan.

23. Erica and Bernadette then properly and in a timely manner made a claim for GAP waiver loss to the third-party gap claim administrator.

24. Because Erica had financed her vehicle service contract and had paid her GAP premium up front, the GAP claim administrator determined in September 2022 that Nissan needed to refund and pay out to the lender any unearned portions of the service contract cost and the GAP waiver premium.

25. The GAP claim administrator estimated that Nissan needed to pay the lender approximately $1,187.03 in vehicle service refund monies and $472.77 in gap waiver refund monies.

26. Erica and Bernadette notified Nissan of the GAP claim administrator's determination and requested that the dealer make the payments to the lender.

27. Nissan falsely assured Erica and Bernadette that it would make the payments, but it did not.

28. In the meantime, because Erica was without a vehicle, Nissan solicited her to purchase another car from Nissan, which Bernadette financed on her own.

29. Thus, while the Aydletts waited for Nissan to pay the lender from the refund of the vehicle service contract and GAP waiver premium from the totaled car, they were already obligated to begin making payments to a new

5

lender on the new car that Nissan had sold them.

30. Plaintiffs learned that Nissan had not paid the lender when they began receiving collection calls and billing statements from the lender showing that they had missed payments on the remaining loan balance.

31. Additionally, the lender began to report Plaintiffs to the credit bureaus as having late payments.

32. Plaintiffs, who have limited means, were then trapped in a lose-lose situation entirely created by Nissan.

33. If Plaintiffs did not continue to make monthly payments to the lender on the totaled vehicle that they no longer possessed, they risked damage to their credit reports and possible lawsuits from the lender.

34. If Plaintiffs did not make payments to their present lender on their new vehicle loan, however, they further risked not only damage to their credit reports, but also repossession of the current vehicle, which was vital to Erica's employment and transportation, since Erica did not live with her mother, but rather, lived and worked 200 miles away in Chapel Hill.

35. Plaintiffs' finances were such that they could not make payments on both loans.

36. Plaintiffs repeatedly contacted Nissan by telephone, by letter, and even in person to ask why Nissan had not paid off the loan and to beg Nissan to make the payments.

6

37. Nissan's employees or agents repeatedly lied to Plaintiffs, assuring them that they were about to make the payments or had made the payments, when the had not. At other times, they put Plaintiffs off without satisfactory explanation.

38. For example, on one occasion, after Bernadette had visited the dealership approximately a half-dozen times without success, Erica drove the three hours from Chapel Hill to try to talk with someone at the dealership face-to-face. Dealership employees refused to talk with her and ignored her for several hours until Bernadette left in the middle of her work day to join her at the dealership.

39. After Bernadette arrived, a dealership employee admitted to the two women that he could not recall what happened to their refund money.

40. The employee also used derogatory and racially-charged language toward plaintiffs, calling them "angry black women."

41. On another occasion, Nissan even gave Plaintiffs documents purporting to show that they had mailed a portion of the payment, but the lender told Plaintiff that it had not received any such payment.

42. In fact, Nissan did not make any payment on the loan until February 2023.

### Nissan Severely Damaged Plaintiffs

43. Nissan's bad conduct has caused both Bernadette and Erica

7

financial damage, emotional distress, inconvenience, and anxiety.

44. By the time Nissan finally sent the Aydletts' refund monies to the lender, the lender had already charged off the loan.

45. Additionally, by the time Nissan sent in the payments, the overdue balance on the loan had accrued late fees and interest which Nissan's payment did not cover.

46. Ultimately, Nissan's bad conduct resulted in severe damage to both Plaintiffs' credit reports, credit scores, and credit reputation, since the lender reported for each Plaintiff that they had missed months of payments culminating in a charge-off.

47. Plaintiffs are unable to persuade or force the lender to change its credit reporting, despite the delinquencies being Nissan's fault, not theirs.

48. Under federal law, the derogatory "charge-off" status of the loan, as well as the history of payment delinquency for the loan, will remain on the women's credit reports for seven years, that is, until September of 2029.

49. The Aydletts feel betrayed by Nissan and outraged that a dealership would treat long-time customers so poorly as it has treated them.

50. Nissan was supposed to refund and pay to the lender the pro-rated amount of money that the Aydletts had paid for the service contract and gap waiver.

51. Instead of using the funds to make the loan payoff, Nissan

8

retained the funds for almost five months to use for its own purposes and only paid off the loan when the Aydletts retained an attorney.

52. The Aydletts feel that, if they had done the same thing, they would have been arrested and charged with a crime, and they wonder how a business can get away without even a slap on the wrist.

53. Because she is a young person just starting out in life, any derogatory accounts on her credit report are difficult for Erica to overcome.

54. Several landlords have already denied her rental application due to the presence of the charge-off.

55. The credit denials were embarrassing and demeaning to Erica.

56. She had to take on a roommate with better credit in order to sign a new apartment lease.

57. She worries that her credit score will prevent her from obtaining rental housing or getting vehicle or mortgage financing in the future.

58. Due to the stress of the financial situation that Nissan's conduct put her in, Erica had to seek medical help, and her provider diagnosed her with anxiety and depression.

59. Bernadette has also experienced credit denial due to the presence of the lender's charge-off on her credit reports. As a result, she was unable to buy an adjustable bed that her husband needs, and was humiliated to be rejected for the financing while standing in her local furniture store. She has

felt discouraged from trying to get credit since then.

60. Nissan's conduct also compounded Bernadette's stress as a full-time caregiver for her disabled husband. She worried about Erica's credit even more than she worried about her own, as Erica is young and just starting out in life. What affects her daughters, affects her. Bernadette also eventually had to seek medical help, and her provider prescribed her on medication for anxiety.

61. Bernadette also feels that Nissan deceived her into taking on a loan to purchase a new vehicle in 2022 when it did not intend to fulfill its obligations to pay out to the original lender the unearned portions of the service contract cost and the GAP waiver premium from the totaled vehicle.

62. Both Plaintiffs have expended considerable time and energy trying to fix a situation that was not their fault, and correspondingly lacked time and energy for work, family, and friends.

63. Plaintiffs had purchased the GAP waiver precisely because Nissan market it to them as a way to avoid the situation they are now in. They trusted their dealership to do right by them and handle their money appropriately, and they are very angry that Nissan betrayed their trust.

64. Nissan's acts and practices are abhorrent, repugnant, and contrary to the public policy of the State of North Carolina.

## FIRST CAUSE OF ACTION

## (FRAUD or, in the alternative, NEGLIGENT MISREPRESENTATION)

65. Plaintiffs re-allege and incorporate herein the allegations of the preceding paragraphs.

66. Defendant Nissan, by and through its agents or employees, made false representations that it would pay out any refunds due on the vehicle service contract and gap waiver premium. It made these representations both in October 2021 when the Aydletts purchased the vehicle that was later totaled, as well as in August 2022 when the Aydletts considered buying a new vehicle after the original vehicle was totaled.

67. These payment guarantees were material to Plaintiffs' decisions in October 2021 to buy the original vehicle that was totaled, as well as in August 2022 to buy the replacement vehicle.

68. Defendant made such false representation knowing them to be false.

69. Defendant made such false representations with intent to deceive Plaintiffs and to cause them to purchase vehicles.

70. Plaintiffs relied on Defendant's false representations and were, in

fact, deceived into entering into agreements to buy vehicles from Defendant in October 2021 and August 2022.

71. Plaintiffs would not have entered into such agreements had they known that Defendant would not actually pay out to their lender the amounts due.

72. Plaintiffs' reliance on Defendant's false representations was reasonable, because, among other factors, such agreements are an optional provision in many retail installment contracts for the purchase of vehicles upon which consumer buyers rely in good faith.

73. Defendant's false representations were fraudulent and proximately caused Plaintiffs' actual damages as described hereinabove.

74. Defendant's officers, directors, and managers participated in and condoned the fraudulent conduct, and Defendant is thus liable to Plaintiffs for punitive damages.

75. In the alternative, Defendant made such false representations negligently and proximately caused Plaintiffs' actual damages as described hereinabove.

## SECOND CAUSE OF ACTION
### (BREACH OF CONTRACT)

76. Plaintiffs re-allege and incorporate herein the allegations of the preceding paragraphs.

77. The Aydletts paid Defendant Nissan for a vehicle service contract and GAP waiver addendum so that their loan payoff would be covered in the event of a total vehicle loss.

78. When the third-party gap claim administrator determined that Defendant Nissan needed to refund portions of the financed vehicle service contract cost or GAP waiver premium, Defendant Nissan had an express or implied contractual obligation to pay those monies to the lender.

79. Defendant Nissan intentionally and consciously disregarded its duty to make the loan payoffs, and thereby damaged Plaintiffs directly, incidentally, and consequentially as described hereinabove.

## THIRD CAUSE OF ACTION

## (BREACH OF FIDUCIARY DUTY)

80. Plaintiffs re-allege and incorporate herein the allegations of the preceding paragraphs.

81. A relationship of trust and confidence existed between the Aydletts and Defendant Nissan such that the Defendant had a duty to act in good faith and with due regard for the Plaintiffs' interests.

82. Defendant Nissan breached this duty by stealing Plaintiffs' refund monies, withholding the monies from Plaintiffs and their lender, and lying to Plaintiffs about the monies to the Plaintiffs' detriment.

83. Defendant Nissan's breach of its fiduciary duty damaged

Plaintiffs as described hereinabove.

## FOURTH CAUSE OF ACTION (IN THE ALTERNATIVE)

### (NEGLIGENCE)

84. Plaintiffs re-allege and incorporate herein the allegations of the preceding paragraphs.

85. In the alternative to the claims made in the First, Second, and Third Causes of Action, Defendant Nissan undertook a duty to Plaintiffs to make payment on their loans.

86. Defendant breached its duty to pay off the loans.

87. Defendant Nissan's negligence proximately caused injury to Plaintiffs as described hereinabove.

## FIFTH CAUSE OF ACTION

### (UNFAIR AND DECEPTIVE ACTS AND PRACTICES)

88. Plaintiffs re-allege and incorporate herein the allegations of the preceding paragraphs.

89. At all times relevant, Defendant Nissan was engaged in commerce in the state of North Carolina.

90. The following acts of Defendant Nissan are unfair and deceptive in that they offend established public policy, are immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers, and have the capacity or tendency to mislead:

14

a. Defrauding or negligently misrepresenting to Plaintiffs Defendant's intent to send the contractually required payment to the lender;

b. Intentionally and consciously breaching an agreement with Plaintiffs to send the contractually required payment to the lender;

c. Violating state regulations pertaining to motor vehicle dealers, including, but not limited to, N.C.G.S. § 20-294(5) and (6) and the Rules of the Division of Motor Vehicles, which penalize dealers who use fraudulent methods in selling vehicles and who commit unfair or deceptive acts; and

d. Other acts and practices to be proven at hearing.

91. Defendant Nissan's conduct proximately caused injury to Plaintiffs as described hereinabove.

92. Defendant Nissan is therefore liable for treble Plaintiffs' actual damages under N.C.G.S. § 75-16 for their claims herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray the Court:

1. That the Court award them actual, incidental, consequential, and punitive damages from Defendant in an amount in excess of twenty-

15

five thousand dollars ($25,000.00) to be determined at trial;

2. That the Court additionally treble all actual damages for the First, Second, Third, and Fourth causes of action pursuant to the Fifth cause of action under N.C.G.S. § 75-16;

3. That Plaintiffs receive a jury trial on all matters;

4. That the Court award Plaintiffs their costs of litigation and reasonable attorney's fees pursuant to N.C.G.S. § 75-16.1; and

5. For such and other further relief to which Plaintiffs hereto may be entitled and which the Court deems just and proper.

THIS day, November 9, 2023.

Respectfully submitted by: *Suzanne Begnoche*

Suzanne Begnoche, Attorney at Law
Attorney for Plaintiff
NCSB # 35158
P.O. Box 2035
Chapel Hill, NC 27515
Telephone: (919) 960-6108
Facsimile: (919) 500-5289
suzanne.begnoche@begnochelaw.com